IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 23-CR-236 (RC) |
| v. | 18 U.S.C. § 231(a)(3) |
| MICHAEL ASBURY, | |
| Defendant. | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, MICHAEL ASBURY, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday,

November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the USCP's ability to perform their federally protected function to protect the U.S. Capitol building and its occupants.

5. At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows

and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

*The Defendant's Participation in the January 6, 2021, Capitol Riot*

8. On January 6, 2021, there was a public disturbance involving acts of violence by an assemblage of three or more persons on the grounds of the United States Capitol. There was an immediate danger of damage or injury to the property or person and any other individual.

9. At approximately 2:49:25 PM, ASBURY entered the doorway to the Lower West Terrace of the Capitol building, also referred to as the "tunnel," by climbing on the left archway, as seen in **Image 1**.



**Image 1**: Still image from Capitol building surveillance footage at 2:49:25 PM, depicting ASBURY at the entrance of the tunnel.

10. About one minute later, at 2:50 PM, ASBURY moved further into the tunnel, leaning his full body weight against the rioter in front of him (with no one pushing ASBURY from behind), as captured in **Image 2**. Additional rioters joined behind him, pushing against him, and they collectively pushed together in a "heave-ho" effort against the police line until at about 2:51 PM. At that point, the mob appeared to have lost its momentum and dissipated backward, ASBURY among them.



**Image 2**: Still image from Capitol building surveillance footage at 2:50:39 PM, depicting ASBURY inside the tunnel participating in a heave-ho effort against the police line.

11.     After this first heave-ho effort, ASBURY stood at the mouth of the tunnel for approximately two minutes. During that time, he handed a police riot shield to rioters outside the tunnel, as part of an effort to disarm the police, as captured in **Image 3**.



**Image 3**: Still image from Capitol building surveillance footage at 2:52:24 PM, depicting ASBURY (red) at the mouth the tunnel handing a police riot shield (blue) to the rioters outside the tunnel.

12.     ASBURY re-entered the tunnel at approximately 2:53 PM ASBURY assisted in throwing a police shield toward the crowd behind him, away from the police line, as captured in **Image 4** and **Image 5**. Other rioters followed suit, taking shields away from the police to remove the officers' defensive equipment.



**Image 4:** Still image from Capitol building surveillance footage at 2:53:30 PM, depicting ASBURY (red) at the mouth the tunnel handing a police riot shield (blue) to the rioters behind him.



**Image 5:** Still image from a journalist's footage depicting ASBURY inside the tunnel holding a law enforcement shield over his head at approximately 2:53:30 PM. This appears to be a mirror image of **Image 4**.

13. ASBURY passed what appeared to be a functional stun gun out of the tunnel to a man in a blue jacket, as captured in **Image 6**. ASBURY then kept moving forward toward the police line.



**Image 6**: Still image from Capitol building surveillance footage at 2:53:57 PM, depicting ASBURY (red) handing another rioter a stun gun (yellow), identifiable by a small red light.

14. The mob, including ASBURY, engaged in another heave-ho effort. ASBURY's weight shifted forward, and he leaned on the rioters in front of him, who were in turn pushing against the police line at the entrance to the building.

15. ASBURY kept moving forward toward the police line, and at approximately 2:56 PM, ASBURY was inside the vestibule doors of the tunnel, as depicted in **Image 7** and **Image 8**.



**Image 7:** Still image from MPD BWC footage depicting ASBURY at the police line inside the tunnel at 2:56:41 PM.



**Image 8:** Still image from a journalist's footage depicting ASBURY and an MPD sergeant inside the tunnel at approximately 2:56:41 PM. It appears to be a mirror-image of **Image 7**.

16. At approximately 2:56 PM, there was a rush of rioters into the tunnel. At approximately 2:57 PM, the rioters, including ASBURY, engaged in another heave-ho effort, their bodies moving in unison forward and back, pushing against the police line. ASBURY began to make his way out of the tunnel at approximately 2:57 PM, after law enforcement sprayed OC spray toward the rioters. He removed the balaclava from his head as he exited.

17. ASBURY re-entered the tunnel at approximately 3:02 PM. At approximately 3:03 PM, while ASBURY was inside the tunnel, the rioters initiated another heave-ho effort, their bodies moving in unison back and forth to apply force against the police line ahead.

18. ASBURY remained at the mouth of the tunnel after exiting. ASBURY remained outside the tunnel until at least 3:41 PM.

19. At the time of ASBURY's actions inside the tunnel, officers with the United States Capitol Police and officers with the Metropolitan Police Department were engaged in their lawful duties—preventing unlawful entry into the United States Capitol.

20. As a result of the civil disorder in Washington, D.C. on January 6, 2021, the United States Capitol Police, who are tasked with protecting the U.S. Capitol building and its occupants, and the United States Secret Service, who had multiple protectees inside the Capitol at the time, were forced to change its normal course of business and deployed additional personnel.

21. As a result of the civil disorder in Washington, D.C. on January 6, 2021, Safeway, a grocery store chain, was forced to close its stores in the District of Columbia earlier than planned on January 6, 2021. As a result, Safeway reported lower sales on January 6, 2021, both as projected and compared to the same date in prior years. Additionally, Safeway delivery shipments from Pennsylvania to the District of Columbia were unable to be completed on January 6, 2021.

*Elements of the Offense*

22. The parties agree that Obstructing Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3), requires the following elements:

   a. First, the defendant knowingly committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

   b. Second, at the time of the defendant's actual or attempted act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

   c. Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.

*Defendant's Acknowledgments*

23. The defendant knowingly and voluntarily admits to all the elements as set forth above.

24. The defendant knowingly and voluntarily admits that the facts as provided in this statement of offense satisfy the elements of 18 U.S.C. § 231(a)(3).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Carolina Nevin
CAROLINA NEVIN
Assistant United States Attorney
District of Columbia
NY Bar No. 5226121
601 D Street, N.W.
Washington, D.C. 20530
202-803-1612
carolina.nevin@usdoj.gov

ADAM M. DREHER
Assistant United States Attorney
District of Columbia
Mich. Bar No. P79246
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, MICHAEL ASBURY, have read this Statement of the Offense and have discussed it with my attorney, SARAH OLESIUK. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 12-1-23

MICHAEL ASBURY
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client, MICHAEL ASBURY, fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 12/1/2023

SARAH OLESIUK
Attorney for Defendant