# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 1:23-cr-236-01-RC** |
| | ) | |
| **MICHAEL ASBURY** | ) | |
| **Defendant.** | ) | |

## SENTENCING MEMORANDUM
## ON BEHALF OF MICHAEL ASBURY

Michael Asbury, through his undersigned counsel, files this Sentencing Memorandum[1] and requests this Honorable Court to determine a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). The final Presentence Investigation Report (PSR) filed in this case correctly calculates a criminal history category of I, but the parties disagree regarding the calculation of Mr. Asbury's total offense level. PSR at ¶ 59; *see* Docs. 46–48. After consideration of the following arguments, Mr. Asbury respectfully requests that this Honorable Court sentence him to a term of probation. *See* 18 U.S.C. § 3553(a). Mr. Asbury agrees with the special conditions of supervision as proposed by U.S. Probation in its Sentencing Recommendation and asks this Court to incorporate those conditions, along with an additional condition to complete community service, as part of a probation sentence. Doc. 49 at pp. 3–4.

In support of his request, Mr. Asbury provides the following:

---

[1] Undersigned counsel has provided an unredacted copy of this Sentencing Memorandum and Exhibit 1 to the Court, the government, and U.S. Probation.

I.      **Procedural History**

This case originated by a Criminal Complaint filed on June 27, 2023. Doc. 7. Mr. Asbury was arrested in the Eastern District of Tennessee at his place of employment the following day. *See* PSR at p. 2. On June 28, 2023, Mr. Asbury was released on his own recognizance in the Eastern District of Tennessee. *Id*. On July 13, 2023, Mr. Asbury appeared via video for an initial appearance in the United States District Court for the District of Columbia on the Criminal Complaint. *Id*. Both the government and U.S. Probation recommended that Mr. Asbury remain out of custody, released on his own recognizance. *See* Doc. 19.

On July 19, 2023, a federal grand jury empaneled in the District of Columbia, returned a five-count Indictment naming Michael Asbury and Nathan Baer. Doc. 21. Count 1—the count at issue in Mr. Asbury's sentencing—charges Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). *Id*. Counts 2–5 charge four misdemeanor offenses. *Id*. Mr. Asbury quickly and decisively accepted responsibility for his conduct. Following his arrest, he immediately signed and agreed to the government's Motion for a Protective Order and entered into a plea agreement with the government. Docs. 20, 35. At all times, he has been compliant with the conditions of his release. *See* Doc. 34; PSR at ¶ 16.

II.     **Nature and circumstances of the offense and history and characteristics of Mr. Asbury**

a.   **Nature and circumstances of the offense**

The events of January 6, 2021, should not be minimized. On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the election results. *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at        https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-

supporters.html. The rally was set for January 6, 2021, the same date Congress was set to certify

Joseph R. Biden, Jr. as the winner of the 2020 presidential election. *See id*.

At the rally, then-President Trump took to the stage bemoaning the election results and

imploring attendees to "fight" for him:

> We will not let them silence your voices. . . . [w]e're going to walk down to the
> Capitol, and we're going to cheer on our brave senators and congressmen and
> women, and we're probably not going to be cheering so much for some of them. . .
> . [If the election is certified], [y]ou will have an illegitimate president. That's what
> you'll have. And we can't let that happen. . . . And we fight. We fight like hell. And
> if you don't fight like hell, you're not going to have a country anymore.

*See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10,

2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-

part-of-impeachment-trial.

When protestors heeded the call of then-President Donal Trump to "fight like hell" and

unlawfully assembled on the grounds of and inside the U.S. Capitol Building, law-enforcement

officers were injured, people died, and the U.S. Capitol Building sustained property damage. *See*

*id*. The breach of the Capitol resulted in the delay of the 2020 Presidential Electoral College and

as a result, many people lost faith in what had been, until that day, a consistent feature of American

democracy: the peaceful transfer of political power. These casualties and disruptions exacted a toll

on Americans and in the wake of January 6, 2021, the United States of America remains fractured.

But certainly the backdrop against which the events of January 6 occurred is mitigating,

especially as applied to individuals, like Mr. Asbury, who did not arrive in Washington with the

intent to storm the Capitol and who did not assault law enforcement. As the Honorable Amit Mehta

remarked at the sentencing of John Lolos:

> [T]here is some mitigation here. [The Defendant] didn't plan this episode. He didn't
> purposely come to Washington, D.C. to storm the Capitol. The fact remains that he
> and others were called to Washington, D.C. by an elected official; he was prompted

> to walk to the Capitol by an elected official. People . . . were told lies, fed falsehoods, and told that our election was stolen when it clearly was not. . . . I think you were a pawn, you were a pawn in a game that was played and directed by people who should have known better[.]

*United States v. John Lolos*, No. 21-cr-243 (APM) (D.D.C. Nov. 23, 2021) (ECF No. 37, pp. 55-56); *see also* Kyle Cheney, *Judge faults Trump for Jan. 6 attack*, POLITIO (Nov. 18, 2021) available at   https://www.politico.com/news/2021/11/19/donald-trump-fault-january-6-attack-523059. Similarly, Mr. Asbury was told lies and given disingenuous directions by people who should have known better. He was not the cause of January 6, nor is he in the classification of people who assaulted law enforcement or others. And crucial to this Court's sentencing determination, Mr. Asbury knows what he did was wrong.

In the immediate aftermath of the events of January 6, 2021, Mr. Asbury's conduct is evident of his remorse and self-accountability. Indeed, on January 17, 2021, years before he was arrested in the instant case, Mr. Asbury voluntarily spoke with agents from the Federal Bureau of Investigation (FBI) without counsel present to discuss his involvement in the events of January 6, 2021. He allowed FBI agents into his home and truthfully answered their questions.

Beginning in May 2021, the FBI made a series of requests to physically surveille Mr. Asbury. These requests were made for month-long periods in May 2021, September 2021–May 2022, and September 2022. In each request, the FBI writes that neither Mr. Asbury nor the circumstances of the case present a dangerous environment. Presumably had Mr. Asbury engaged in concerning behavior to the FBI during the year plus period he was under FBI surveillance, law enforcement would have reacted. But during this time period, Mr. Asbury did nothing concerning or illegal. Mr. Asbury and his wife went to work, his children went to school, and Mr. Asbury had no contact with law enforcement again until his arrest on June 28, 2023.

Upon his arrest, Mr. Asbury again voluntarily provided the FBI with a statement, waiving his constitutional rights to counsel and to remain silent. Mr. Asbury provided the FBI with his DNA and fingerprints. At all times, he was polite and cooperative with law enforcement.

During the pendency of this case, undersigned counsel has observed Mr. Asbury to be remorseful and penitent. He has been polite, kind, and shown appreciation for all members of the Federal Defender staff. Mr. Asbury's family and friends write of his shame and the remorse he feels for his actions on January 6, 2021. *See* Ex. 1. During allocution, this Court will hear Mr. Asbury express his sincere remorse—without any excuses—for his conduct and actions on January 6, 2021.

### b.  Mr. Asbury's history and characteristics

Michael Asbury is a 44-year-old husband and father of two children. PSR at ¶¶ 67, 78; Ex. 1. Mr. Asbury's childhood—one of abuse, abandonment, poverty, and instability—was a childhood that no child should ever have to experience. Mr. Asbury's early childhood was tumultuous due to his parents' substance abuse and frequent periods of incarceration. *Id*. at ¶¶ 69–71. This resulted in Mr. Asbury being passed "back and forth" between his mother and father and grandparents. *Id*. at ¶ 71. His family struggled financially, and as a result, moved frequently between trailers and small apartments. *Id*.

When Mr. Asbury was five, his parents divorced. *Id*. at ¶ 69. His mother remarried, and Mr. Asbury's already unstable childhood also became violent. He witnessed his alcoholic step-father choking his mother, and was paddled by his step-father when his step-father felt the young Mr. Asbury needed "a good lashing." *Id*. at ¶ 72. ████████████████

██████████████████████████████████████████████████

████

It is against this backdrop of trauma that Mr. Asbury's role as a supportive partner to his wife and parent to his two teenage children is particularly remarkable. Each time undersigned counsel has spoken with Mr. Asbury during the year-long pendency of this case, he has spoken of his wife, children, and the deep responsibility and shame he holds for the conduct that brings him before this Court. Mr. Asbury reflects upon his own unstable upbringing when discussing the structure, love, and stability he strives to provide for his wife and children.

Mr. Asbury is a tremendously involved father and husband. *See* Ex. 1. His friends and family describe him an attentive father, husband, and community member. He is a "wonderful father," "supportive of his children's education," and present and involved his community. *Id*. Mr. Asbury is involved in both of his children's music-focused extracurricular activities, volunteering his time to "build sets, cook burgers, [and] move equipment." *Id*. It is the words of his oldest child, A.A., that undersigned counsel finds most poignant. A.A. writes her father "[m]ost importantly … has raised me to be grateful and kind." *Id*. If we could all be so lucky to raise children who are grateful and kind.

Mr. Asbury is a high school graduate with a steady work history who volunteers in his community "spread[ing] his love of music" with others. PSR at ¶¶ 99–105; Ex. 1. Mr. Asbury is a talented construction manager and responsible employee, building homes for others in East Tennessee. *See id*. Those who have had homes built by Mr. Asbury describe him as "professional, helpful, and kind" during an often-stressful process. Ex. 1. Mr. Asbury is "dependable," takes pride in his trade, is communicative with clients during the home-building process, and "goes out of his way" to make sure the construction projects he is a part of are completed with quality craftsmanship. *See id*.

In addition to being a proud father, husband, and craftsman, Mr. Asbury is also a gifted musician, a talent and gift he shares freely with his family and community. *See id*. Mr. Asbury's daughter is active in musical theatre and his son is in the marching band. *Id*. During his interview with U.S. Probation, Mr. Asbury spoke proudly about his daughter's role in a recent school musical. The interviewer asked Mr. Asbury how many times he had seen the school musical; he answered that he attended every performance except one—the one performance that coincided with the evening his son was performing in a band concert.

"Music is one of the oldest forms of human expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). "Music can lift us out of depression or move us to tears—it is a remedy, a tonic, orange juice for the ear." Oliver Sacks, *Musicophilia* 170 (2007). In East Tennessee, the Cradle of Country Music, musical tradition runs deep; the community that music creates runs through the veins of the region. *See, e.g.*, Chris Wohlwend, *Where the Hills and Hollows Are Alive With Music* N.Y Times, Oct. 31, 2014, https://www.nytimes.com/2014/11/02/travel/where-the-hills-and-hollows-are-alive-with-music.html. In his willingness to share his talents, Mr. Asbury follows in that tradition.

Community members write of Mr. Asbury's musical talents and his willingness to share his gift with others, performing with friends and donating his time to the music programs in the public school system. Ex. 1. Jim Kennedy, a beloved and long-time music teacher in in the Knox County school system, writes about a recent performance Mr. Asbury gave at a local high school. *Id.* In describing the performance, Mr. Kennedy states, "[w]e just didn't just hear the music, we felt it." *Id*. He goes on to write that "[Mr. Asbury] simply makes me feel better when he is around." Other letters of support echo this sentiment. *Id*.

Without doubt, January 6 fractured the United States. But Mr. Asbury's willingness to give back to his community is the antidote. He recognizes the fundamental deceit of the perpetrators of the riot and his culpability in that day. He returns to a community where he has the genuine opportunity to reach his fellow citizens and engage them in the thoughtful discourse that was lost on January 6. And so it is through music—his gift, his talent—that Mr. Asbury seeks to atone for his conduct.

III.   **The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment**

A sentence of probation, coupled with the restorative nature of community service, would properly encompass the factors set out in 18 U.S.C. § 3553(a)(2)(A). A sentence of probation would allow Mr. Asbury to continue to provide for his family, while still depriving him of many liberty interests. This factor dovetails with the factor set out in 18 U.S.C. § 3553(a)(6) and will be further discussed in section VII.

IV.   **The need for the sentence imposed to afford adequate deterrence to criminal conduct and protect the public from future crimes of Mr. Asbury**

Title 18 U.S.C. Section 3553(a)(2)(B) instructs the sentencing court to consider deterrence as a factor in determining a sentence that is "reasonable" for a particular offender. Title 18 U.S.C. Section 3553(a)(2)(C) further instructs the sentencing court to consider the need to protect the public from any future crimes of Mr. Asbury. In *Gall v. United States*, 552 U.S. 38, 44 (2007), the United States Supreme Court found that even a sentence of probation is not "an act of leniency," but rather a "substantial restriction of freedom." The Court went on to quote the District Court Judge's memorandum, emphasizing that, the defendant

> "will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or,

perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term."

*Id.* (quoting *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005)).

By charging and convicting Mr. Asbury of a felony offense, the government has already achieved a deterrent effect. As a result of this charge and conviction, media outlets have already discussed Mr. Asbury and his conduct on January 6. There is likely to be a renewed media interest in this case at its conclusion. Mr. Asbury's conduct on January 6 is sure to be discussed in conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality which he must endure. The public and private damage to Mr. Asbury's reputation sends a strong message of deterrence to anyone who might contemplate such conduct in the future. In sum, the deprivations of liberty that come with a probation sentence, along with the permanent deprivation of rights and social stigma that accompany Mr. Asbury's felony conviction, will achieve the goals of general and specific deterrence set out in 18 U.S.C. § 3553(a)(2)(B).

## V.   The need for the sentence imposed to provide Mr. Asbury with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

As set forth in the PSR and section outlining Ms. Asbury's history and characteristics, Mr. Asbury has a high school diploma and is gainfully employed as a construction manager. PSR at ¶¶ 94, 99–100. He does not suffer from serious health issues and does not have a substance use disorder or mental health concerns. *See id.* at ¶¶ 84, 86, 92. Any corrective measures Mr. Asbury needs can be most effectively accomplished in a non-carceral setting. *See* 18 U.S.C. § 3553(a)(2)(D).

**VI.** **The kinds of sentences available, the applicable category of offense committed by Mr. Asbury as set forth in the Guidelines, any pertinent policy statements, and the need to avoid unwarranted sentencing disparities among similarly situated defendants**

As stated in the opening of this filing, there is a disagreement over the calculation of Mr. Asbury's total offense level. The government and Mr. Asbury filed objections to the draft PSR. Docs. 46–47. Mr. Asbury now further objects to the final PSR's application of the three-level enhancement for physical contact as set out in U.S.S.G. §2A2.4(b)(1)(A); the draft PSR did not apply this enhancement. Docs. 44, 48. In making this objection, Mr. Asbury primarily replies upon two cases in this District: *United States v. Victoria White*, No. 1:21-cr-563 (JDB) (D.D.C. Aug. 17, 2023) (ECF No. 81, p. 3) and *United States v. Stephanie Hazelton*, No. 1:21-cr-30 (JDB) (D.D.C. Jun. 14, 2023) (ECF No. 59).

Like Mr. Asbury, Victoria White entered a guilty plea to violating 18 U.S.C. § 231(a)(3). *See United States v. White*, No. 1:21-cr-563 (JDB) (D.D.C. Aug. 17, 2023) (ECF No. 81). Though convicted of the same offense, Ms. White's conduct on January 6 is objectively more serious than Mr. Asbury's; yet the government did not seek the physical contact enhancement set out in U.S.S.G. §2A2.4(b)(1)(A). *See id*. at ECF No. 81, p. 3. Ms. White was directly involved in hoisting another rioter above the crowd in the Lower West Tunnel, allowing that person to assault officers by swinging from the top of the tunnel entrance and kicking the officers. *See id*. at ECF No. 82 at pp. 4–5. Ms. White encouraged others to push forward to the front of the crowd of rioters, eventually succeeding in reaching the Lower West Terrance entrance. *Id*. Ms. White, standing directly in front of the line of officers in riot gear, again attempted to push through the line of officers, who were using their shields, batons, and other riot control equipment to keep the crowd back. *Id.*

Ms. Hazelton likewise pleaded guilty to violating 18 U.S.C. § 231(a)(3). *United States v. Hazelton*, No. 1:21-cr-30 (JDB) (D.D.C. Oct. 14, 2022) (ECF No. 45). Like Mr. Asbury, Ms. Hazelton was present in the Lower West Terrance tunnel on January 6, 2021. *Id.* at ECF No. 46 at pp. 3–5. Her conduct involved joining in multiple confrontations with law enforcement officers, encouraging others to push against officers and waving rioters into areas that officers were trying to clear out. *Id.* She encouraged the crowd saying, "Let's go! Move forward! They cannot stop us all," and, "[t]his is battle. This is it. This is the battle." *Id.* As the crowd was assaulting officers, she remained in the area yelling, "[w]e need more men! We need more men! Keep going!" *Id.* At a contested sentencing, the Court declined to apply the physical contact enhancement under the same aiding and abetting theory the government now advances in Mr. Asbury's case.

In *Kimbrough v. United States*, 552 U.S. 85 (2007), the United States Supreme Court acknowledged the risk of differences in outcomes that its holding entailed and acknowledged that "it is unquestioned that uniformity remains an important goal of sentencing." *Id.* at 107. But the *Kimbrough* Court reminded that when it rendered the Guidelines advisory in *Booker*, "some departures from uniformity were a necessary cost of the remedy we adopted." *Id.* at 108 (citing *United States v. Booker*, 543 U.S. 220, 263 (2005)). Moreover, the Court explained these differences would advance the theory of the advisory system, under which "advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to 'avoid excessive sentencing disparities.'" *Id.* at 107 (quoting *Booker*, 543 U.S. at 264).

Ultimately, the Court explained, under the "instruction" of § 3553(a)(6), district courts must consider what other judges are doing and how a guideline itself may create unwarranted disparities:

> [D]istrict courts *must* take account of sentencing practices in other courts and the 'cliffs' resulting from the statutory mandatory minimum sentences. To reach an appropriate sentence, these disparities *must* be weighed against the other § 3553(a) factors….

*Id.* at 108 (emphasis added). While "[t]hese measures will not eliminate variations between district courts," they are the constitutional way to ensure that judges may grant variances from the guidelines when warranted, which will inform the Guidelines' evolutionary process as envisioned by Congress in passing the Sentencing Reform Act of 1984 and as finally allowed to function unhindered in the post-*Booker* advisory system. *Id.* at 107; *Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Rivera*, 994 F.2d 942, 949-50 (1st Cir. 1993) (Breyer, C.J.). Notably, the Supreme Court did not say or suggest that a guideline—simply because it is an existing guideline—is and must be the "barometer for promoting nationwide sentencing uniformity." *See United States v. Hymes*, 19 F.4th 928, 936 (6th Cir. 2021).

It is against this backdrop that Mr. Asbury asks this Court to impose a sentence of probation, regardless of what the Court determines his advisory guidelines to be. *See United States v. White*, No. 1:21-cr-563 (JDB), ECF No. 92, (D.D.C. Nov 22, 2023) (rejecting the government's request for four months' incarceration and sentencing the defendant, convicted of 18 U.S.C. § 231(a)(3), to eight days' intermittent confinement, three months' home detention, and 24 months of probation; *United States v. Hazelton*, No. 1:21-cr-30 (JDB), ECF No. 59 (D.D.C. June 14, 2023) (taking the defendant's familial obligations into consideration when rejecting the government's request for 11 months' incarceration and sentencing the defendant, convicted of 18 U.S.C. § 231(a)(3), to 10 days' incarceration, 90 days home detention, and 24 months of supervised release); *see also*, *United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, (D.D.C. Feb. 9, 2024) (rejecting the government's request for 11 months' incarceration, and sentencing the

defendant, convicted of 18 U.S.C. § 231(a)(3) with the application of the three level physical contact enhancement, to 6 days' intermittent confinement and 24 months of probation.

Sentencing Mr. Asbury to a term of incarceration would place an extraordinary burden and loss of essential care and financial support to his wife and school-age children. Mr. Asbury is an indispensable member of his family. The Asbury family is in a busy season of life, a phrase that surely resonates with parents and caretakers alike. Mr. Asbury is an involved parent, shuttling his children to and from school and extracurricular activities and spending quality time with each of his children teaching them life skills. *See* Ex. 1.

Financially, Mr. and Mrs. Asbury have clawed their way into the lower middle class through hard work. They have endured a bankruptcy. *See* PSR at ¶ 117. They receive no financial support from family or other sources; they have no safety net. *See id*. at ¶ 106. This is a family who largely lives paycheck-to-paycheck; Mr. Asbury's paycheck is the family's main source of income. *Id*. When Mr. Asbury does not work, he does not get paid. No member of the family has health insurance; the Asburys all rely on urgent care facilities and pay out of pocket for medical care when they are sick. *Id*. at ¶ 115. U.S. Probation agrees that the family's financial situation is precarious, and finds "it does not appear [Mr. Asbury] has the financial ability to pay a fine in this matter." *See id*. at ¶ 123. Pointedly stated, without Mr. Asbury's income, the Asburys risk losing what they have worked so hard to achieve for their children and themselves.

**VII.** **<u>The need to provide restitution to any victim of the offense</u>**

Mr. Asbury stands ready to meet his restitution obligation. *See* PSR at ¶¶ 148-149. Mr. Asbury submits that a sentence of incarceration is not necessary to satisfy—and in fact could be detrimental to—the sentencing factor in 18 U.S.C. § 3553(a)(7).

## VIII.  **Conclusion**

Mr. Asbury accepted responsibility in his case quickly and is remorseful for his actions. A sentence of probation would allow Mr. Asbury to continue his caretaking and financial support of his family and is consistent with sentences of similarly situated individuals. If the Court is not inclined to give a sentence of probation, Mr. Asbury requests that the Court consider alternative sentences, including a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, or home detention for imprisonment. *See* U.S.S.G. § 5C1.1(c)(3). A sentence that allows Mr. Asbury to continue to provide for his family properly addresses Mr. Asbury's history and characteristics, the nature and circumstances of the offense, and the need for just punishment.

Respectfully submitted, this 16th day of August, 2024.

FEDERAL DEFENDER SERVICES
OF EASTERN TENNESSEE, INC.

BY:    /s/*Sarah H. Olesiuk*
Sarah H. Olesiuk
Assistant Federal Defender
TN Bar No. 030290

Federal Defender Services
of Eastern Tennessee, Inc.
800 S. Gay St., Suite 2400
Knoxville, TN 37929

COUNSEL FOR DEFENDANT

14