**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-236 (RC)** |
| **MICHAEL ASBURY,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Michael Asbury to 11 months of incarceration (the midpoint of the Guidelines range), 36 months of supervised release, $2,000 in restitution, and a mandatory special assessment of $100.

I.      **INTRODUCTION**

The defendant, Michael Asbury, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

_____

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9

Asbury, a construction manager, was 41 at the time of the offense. He was part of the mob that overran the West Plaza on the Capitol grounds. He climbed onto the media tower, which had been erected in anticipation of the Inauguration, where he cheered on his fellow rioters who were confronting the police line. When the mob breached the police line, Asbury joined the rioters in the Lower West Terrace tunnel, which was the site of the most violent clashes on January 6. In the tunnel, Asbury participated in at least three heave-ho efforts, where rioters joined collectively to push against the police line that was guarding the entrance to the building. He also passed a stun gun and police riot shields back to other rioters and away from the police, diminishing the officers' ability to protect themselves from the violent mob. While Asbury was in and around the tunnel, he was cheering on his fellow rioters, smiling, and laughing with them. Asbury later lied to the FBI in a post-arrest interview, stating that he was inside the tunnel to help other rioters who had been hurt.

The Government recommends that the Court sentence Asbury to 11 months of incarceration. This sentence reflects the gravity of Asbury's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The Government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 36, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

2020, presidential election.

At approximately 2:30 p.m., significant sections of the police line on and near the United States Capitol's Lower West Terrace broke as the rioters in the crowd swarmed and overwhelmed the law enforcement officers. Some of the rioters were able to penetrate the scaffolding, a position that gave them access to the stairs to the upper terraces where there are several key doors, including the doorway to the Lower West Terrace, also referred to as the "tunnel." Officers from the USCP and the Washington, D.C. Metropolitan Police Department (MPD) formed a police line in the tunnel blocking that entrance to the United States Capitol building and were repeatedly fending off assaults by some of the rioters. At approximately 2:42 p.m., rioters began entering the tunnel and ambushing the officers. The rioters broke the glass and forced the doors open. In response, the USCP and MPD officers formed a police line blocking that entrance to the U.S. Capitol building. From approximately 2:42 p.m. and on, numerous rioters were consistently attempting to breach the police line that formed in the tunnel. The rioters used various weapons, as well as the force of their bodies, in an attempt to overcome the officers. Many of the rioters assaulted MPD and USCP officers by hurling objects towards the officers, physically striking officers with batons and other blunt instruments, using lights to distract and disorient the officers, using electrical shock devices, crushing officers between the doors and walls of the confined space, and by deploying chemical sprays and fire extinguishers against the officers.



*Image 1: West Front of the Capitol.*

**B.      Asbury's Role in the January 6, 2021, Attack on the Capitol**

Asbury and his cousin traveled from Tennessee to Washington, D.C., on January 5. They attended the "Stop the Steal" rally at the Ellipse on January 6. They walked from the rally to Capitol grounds, where they entered on the West Front. Asbury climbed onto the media tower and cheered on his fellow rioters.



*Image 2: Asbury on the media tower on the West Front.*

When the rioters on the West Front pushed a huge "TRUMP 2020" sign in a metal frame toward the police line at approximately 1:40 p.m., Asbury placed his hand on the sign while standing on the media tower, assisting them.



*Image 3: Asbury's hand on the "TRUMP 2020" sign on the West Front. Screenshot from Sentencing Exhibit 1 at 00:09.*

After the rioters swarmed the Lower West Terrace at 2:30 p.m., and before Asbury entered

the tunnel at 2:49 p.m., he stood on a ledge of the Lower West Terrace and danced in celebration.

*See* Sentencing Exhibit 2 at 00:12 to 00:20.



*Image 4: Asbury on the ledge of the Lower West Terrace. Screenshot from Sentencing Exhibit 2 at 00:19.*

6

Capitol building surveillance footage captured Asbury on the left archway of the tunnel at approximately 2:49:25 p.m. From the vantage point at the mouth of the tunnel, Asbury could see the large formation of police officers—who were positioned beyond the crowd of rioters—defending an entrance to the Capitol Building, and could hear the door alarm from the emergency exit blaring.



*Image 5: Asbury at the entrance of the tunnel.*

About one minute later, at 2:50:39 p.m., Asbury moved into the tunnel and leaned his full body weight against the rioter in front of him, with no one pushing him from behind initially. Additional rioters then joined behind him, pushing against him, and they collectively pushed together in a "heave-ho" effort against the police line until at about 2:51:20 p.m. *See* Sentencing Exhibit 3 at 01:30 to 02:11. At that point, the mob appeared to have lost its momentum and dissipated backward, Asbury among them.



*Image 6: Asbury inside the tunnel participating in a heave-ho effort against the police line.*

After this first heave-ho effort, Asbury stood at the mouth of the tunnel for approximately two minutes, with nothing preventing him from retreating. During that time, he handed a police riot shield to rioters outside the tunnel, as part of an effort to disarm the police.



*Image 7: Asbury (red) at the mouth the tunnel handing a police riot shield (blue) to the rioters outside the tunnel.*

Asbury re-entered the tunnel with the apparent intention to re-engage with the police line at approximately 2:53:19 p.m. A rioter next to him sprayed toward the police line with OC spray. Another rioter directly behind him threw a large object toward the police line. Asbury assisted in throwing a police shield toward the crowd behind him, away from the police line. Other rioters followed suit, taking shields away from the police in an effort to disarm them.



*Image 8: Asbury (red) at the mouth the tunnel handing a police riot shield (blue) to the rioters behind him.*



*Image 9: Asbury inside the tunnel holding a law enforcement shield over his head at approximately 2:53:30 p.m. This is a mirror image of Image 8. Screenshot from Sentencing Exhibit 5 at 00:15.*

Asbury passed what appeared to be a functional stun gun out of the tunnel to a man in a

blue jacket.[2] He kept moving forward toward the police line.



*Image 10: Asbury (red) handing another rioter a stun gun (yellow), identifiable by a small red light.*

The mob, including Asbury, engaged in another heave-ho effort. Asbury's weight shifted forward, and he leaned on the rioters in front of him, who were, in turn, pushing against the police line at the entrance to the building. This second push, around at 2:54:28 p.m., was shorter than the initial push. *See* Sentencing Exhibit 3 at 05:19 to 05:37. By this time, Asbury was fully aware of the circumstances in the tunnel, given that he had previously viewed the police line from an elevated position while standing the archway, had participated in a heave-ho effort, and worked with other rioters to take shields away from the police.

Asbury kept moving forward toward the police line, he was inside the vestibule doors of

---

[2] The man in the blue jacket has been identified as Vitali GossJankowski (21-cr-123). No prior interaction between Asbury and GossJankowski has been identified. GossJankowski told the FBI that he recovered the stun gun from the ground, but the video evidence contradicts this statement.

the tunnel around 2:56:41 p.m. Police are heard yelling, "Ladies and gentlemen, back up!" and

"Get back!" while an alarm is sounding. *See* Sentencing Exhibit 5 at 03:23 to 03:35.



*Image 11: Still image from Sgt. Bogner's BWC footage depicting Asbury at the police line inside the tunnel at 2:56:41 p.m.*



*Image 12: Asbury and Sgt. Bogner inside the tunnel at approximately 2:56:41 p.m. This is a mirror-image of Image 11. Screenshot from Sentencing Exhibit 5 at 03:51.*

At approximately 2:56:39 p.m., there was a rush of rioters into the tunnel. At approximately

2:57:00 p.m., the rioters, including Asbury, engaged in another heave-ho effort, their bodies moving in unison forward and back, pushing against the police line. Asbury began to make his way out of the tunnel at approximately 2:57:40 p.m., after law enforcement sprayed OC spray toward the rioters. He removed the balaclava from his head as he exited, appeared to rub his eyes, and grabbed onto the side of the tunnel to steady himself. *See* Sentencing Exhibit 3 at 08:32 to 09:00.

At approximately 3:00:28 p.m., Asbury was standing at the mouth of the tunnel and engaged in conversation with David Mehaffie,[3] dubbed #tunnelcommander by citizen sleuths online, due to his having directed the movement of the rioters inside the tunnel. Mehaffie pointed in the direction of Asbury, said something, and Asbury nodded his head "yes" and responded.[4] Asbury stood at the mouth of the tunnel for approximately two minutes, with the apparent capability to leave the premises. Despite this, he re-entered the tunnel at approximately 3:02:04 p.m.

---

[3]  Mehaffie (21-cr-40) was convicted at trial on 9/13/22 of  four offenses, including two felony charges: aiding and abetting in assaulting, resisting, or impeding law enforcement officers, and interfering with a law enforcement officer during a civil disorder.

[4]  The conversation between Asbury and Mehaffie is not audible, because it was captured on U.S. Capitol CCTV, which does not have sound.



*Image 13: Asbury (red) and Mehaffie (purple) at the mouth the tunnel.*

At approximately 3:03:43 p.m., while Asbury was inside the tunnel, the rioters initiated another heave-ho effort, their bodies moving in unison back and forth to apply force against the police line ahead. *See* Sentencing Exhibit 3 at 14:34 to 15:05. Asbury again maneuvered his way to the front of the police line at approximately 3:04:07 p.m. The footage of another rioter captured Asbury inside of the doors leading into the building, where the police line was. At the moment that Asbury reached the front of the line, rioters behind him surged forward and began the back-and-forth heave-ho effort against the police. The video shows rioters with hands on each other's backs, pushing back and forth. *See* Sentencing Exhibit 6 at 00:18 to 01:14.

14



*Image 14: Asbury beyond the doors to the Capitol building. Screenshot from Sentencing Exhibit 6 at 00:50.*

The police employed OC spray to disperse the rioters, and many, including Asbury, turned around to exit the tunnel as a result. He exited the tunnel at approximately 3:05:41 p.m.

Asbury remained at the mouth of the tunnel after exiting. From approximately 3:16 p.m. to 3:42 p.m., Asbury cheered on his fellow rioters, laughed, and smiled at the mouth of the tunnel.

*See* Sentencing Exhibit 4 at 11:56 to 12:04.



*Image 15: Asbury smiling at the mouth of the tunnel at 3:16:07 p.m.*



*Image 16: Asbury at the mouth of the tunnel at 3:17:04 p.m., cheering on his fellow rioters.*



*Image 17: Asbury laughing at the mouth of the tunnel at 3:26:41 p.m.*



*Image 18: Asbury smiling at the mouth of the tunnel at 3:42:11 p.m.*

Asbury was on Capitol grounds for at least two hours.

### *Asbury's Post-Arrest Statement*

On June 28, 2023, the date of Asbury's arrest, the FBI interviewed Asbury after he waived his *Miranda* rights.

Asbury stated that he and his cousin decided on January 5 to travel to Washington, D.C. for the "Stop the Steal" rally on January 6. He saw tweets from the president saying, "It's gonna be wild." He knew that "craziness" was going to happen on January 6 and that it was likely to get out of hand, and he wanted to go "just to see it."

Asbury heard President Trump speak at the rally. Asbury explained that there were some people at the rally because they felt the election was stolen, but there were also people there with signs against covid restrictions and vaccination requirements, which he described as "antithetical to the Constitution." He thought that it was highly likely that things would get out of hand and that there would be violence, because there were so many people together and emotions were high.

Asbury and his cousin went to the Capitol because there were talks that that's where the protest was. Trump said, "We're going to go to the Capitol." It wasn't spontaneous. Upon his arrival at Capitol grounds, it was initially peaceful, but it was clear to Asbury that the police were severely outnumbered. He knew there was a high probability that things would get out of hand. Things began to escalate as more people arrived on Capitol grounds. He saw police officers strike a woman from behind, throwing her to the ground. He and his cousin helped the woman and were in disbelief about what was happening.

Asbury remembers smoke bombs going off, and that the situation kept getting worse throughout the day. He saw a man with his cheek blown out. At some point, people broke through the bike rack barricades. Asbury saw people shoving the barricades and wrestling with the police

for them. Part of the escalation was that the police were using smoke grenades and shooting rubber bullets; all that did was rile up the crowd.

Asbury saw people climbing on the scaffolding. There were people pushing their way into what he described as "the tunnel." He was standing on the side of the tunnel to get an idea of what was going on inside. An older man told him that people were getting trampled in there and they had to get them out of there. Asbury made his way into the tunnel and tried to move people over so that injured people could get out. While inside the tunnel, he was trying to not get hurt. He was being pushed from behind and "squashed."

Asbury entered the tunnel for a second time to assist people. He stated that he went into the tunnel twice. Asbury was pepper-sprayed while inside the tunnel, so he exited.

While inside the tunnel, Asbury remembers seeing shields go over his head. He also remembered a taser being passed out of the tunnel, and he thought he may have put his hands on the taser. He stated that he remembered seeing it and thinking, "That doesn't need to be in here."

After the tunnel was cleared out by the police, Asbury tried to calm the crowd down. He told the cops, "You guys are doing a good job!" He remembers getting a fist bump from an officer on the side of the tunnel during this time.

When Asbury saw things getting too out of hand, specifically, when he saw a woman breaking windows with a pickaxe, he found his cousin, from whom he had gotten separated, and they left Capitol grounds. They started their drive back to Tennessee that night.

Asbury identified himself in multiple images from January 6. He stated that to the best of his recollection, he did not pass police shields. When confronted with a photo of him passing a shield (Image 9), he admitted it was him. He denied participating in a heave-ho effort. He stated

that he was caught in between people at the time. He denied touching police officers, engaging in violence, or breaking anything.

When asked what he thought of January 6 two years later, Asbury stated that he wished he had never gone, and said, "I'm really, really sorry that those police officers got hurt."

### III.    THE CHARGES AND PLEA AGREEMENT

On July 19, 2023, a federal grand jury returned an indictment charging Asbury with five counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). On March 20, 2024, Asbury was convicted of this offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Asbury now faces sentencing on Civil Disorder, 18 U.S.C. § 231(a)(3). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Asbury faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution of $2,000, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the PSR's Guidelines calculations:

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(A) | Special Offense Characteristic: Physical Contact | +3 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| | **Total** | **11** |

**A. The three-level special offense characteristic for physical contact applies.**

20

The Probation Office correctly recommends the three-level enhancement for physical contact under U.S.S.G. §2A2.4(b)(1)(A). PSR ¶ 48.

Asbury joined with a group of other rioters in at least three separate collective "heave-ho" pushes against a line of law enforcement officers in the Lower West Terrace tunnel who were attempting to restrain the crowd. *See* Statement of Offense, ECF No. 36, ¶¶ 10, 14, 16. Asbury's participation in the collective pushes was both intentional and deliberate, as he exited and re-entered the tunnel repeatedly to participate in these heave-ho efforts. The guidelines do not require that the defendant himself make physical contact with his victim, only that the offense be designed to cause physical contact. *See e.g., United States v. Taliaferro*, 211 F.3d 412, 415–16 (7th Cir. 2000) ("physical contact" under §2A2.4(b)(1) includes throwing a cup of urine at a prison guard because the law of battery has long included indirect acts such as spitting). In this case, Asbury's intended target was the police line and his physical energy, as well as the collective energy of his co-defendant and the other rioters in the tunnel, was directed at forcibly pushing those officers out of the way. Because he was aiding and abetting an effort to push these officers, and the officers felt the result of that physical force, Asbury's offense involved physical contact.

Under similar circumstances, Judge Nichols applied the three-level physical contact enhancement in *United States v. Kumer*, 23-cr-237 (CJN), where the defendant joined in at least three separate collective "heave-ho" pushes against the police line in the tunnel. One of these pushes resulted in injury to a police officer. Although the defendant did not make direct physical contact with any police officer, the Court applied the enhancement.

Judge McFadden applied the three-level enhancement in *United States v. Crowley*, 23-cr-45 (TNM), where the defendant engaged in multiple heave-ho efforts and pushed police officers

in the tunnel. Although the situation in the instant case is slightly different, Asbury's knowing and active participation in the collective effort of multiple rioters pushing together against a police line amounts to physical contact intended at impeding the officers' ability to perform their duties.

### B. The Court should not apply the two-level decrease pursuant to Section 4C1.1.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 is in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement.

The Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 59. It nevertheless did not apply the two-level decrease pursuant to § 4C1.1, because Asbury used violence in the instant offense. PSR ¶ 54. The Court should do the same here.

Asbury is not eligible for this decrease because he used violence or credible threats of violence in connection with the offense. *See* U.S.S.G. § 4C1.1(3). Judge McFadden defined violence as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF No. 195 at 4-5. Judge McFadden also defined it as "the "exertion of any physical force so as to injure or abuse." *Id.*; *see also United States v. Hernandez*, 21-cr-445 (CKK), ECF No. 65 at 5 (adopting Judge McFadden's definition of violence from *Bauer*).

Judge McFadden defined the credible threat of force as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF No. 195 at 6. When examining whether Asbury's conduct posed a credible threat of violence, the Court must consider the totality of the circumstances surrounding that conduct:

22

In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.

*United States v. Andrulonis*, 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

The Government is aware that in *Crowley*, Judge McFadden ruled that the defendant's pushing in the tunnel was not violent, and that a credible threat of violence had to amount to more than mere presence in tunnel. Although the Government agrees that mere presence is not sufficient, it disagrees with the Court's ruling in Crowley. In Crowley, in ruling that the defendant's conduct was not a credible threat to violence, he cited the Sixth Circuit's decision in *United States v. Pineda-Duarte*, 933 F.3d 519 (6th Cir. 2019), that a credible threat to violence, pursuant to U.S.S.G. § 2D1.1(b)(2), required the defendant to have the intent to injure another, and that the intent must be credibly communicated. *United States v. Pineda-Duarte*, 933 F.3d at 522. Here, Asbury participated in multiple heave-ho efforts, with the aim of overwhelming the police line through its sheer force of numbers. The rioters yelled together, "Heave! Ho!" as they pushed against the police line, communicating their intent to physically overpower the police. This is both violence and a credible threat to violence that disqualifies Asbury from the two-level decrease under U.S.S.G. § 4C1.1.

The Government is also aware of multiple cases in which courts have rejected the application of § 4C1.1 to January 6 defendants. Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the

Government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the Government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

Accordingly, based on the Government's calculation of the Asbury's total adjusted offense level, after acceptance of responsibility, at 11, Asbury's Guidelines imprisonment range is 8 to 14 months.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Asbury's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

---

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The Government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

In the tunnel, Asbury participated in at least three heave-ho efforts, where rioters joined collectively to push against the police line that was guarding the entrance to the building. He also passed police riot shields to the rioters and away from the police, diminishing the officers' ability to protect themselves from the violent mob. Asbury entered and exited the tunnel various times, including at one point where the police deployed OC spray to get Asbury and the other rioters out of the tunnel. Asbury had multiple opportunities to leave Capitol grounds, but nevertheless stayed to obstruct the police.

Despite engaging in serious obstructive conduct that made it easier for his fellow rioters to perpetuate assaults on police officers and made it more difficult for the police to defend themselves and the Capitol, Asbury maintained a shockingly light and happy attitude throughout the day. When the rioters overran the West Plaza and mobbed the Lower West Terrace, Asbury cheered on his fellow rioters and danced a celebratory dance on a ledge. While outside the tunnel, he smiled and laughed with other rioters. Asbury's attitude demonstrated a total lack of empathy for the police officers and a complete disregard of the grave nature of the riot in which he was participating.

The nature and circumstances of Asbury's offense were of the utmost seriousness, and fully support the Government's recommended midpoint sentence of 11 months of incarceration.

### C.  The History and Characteristics of the Defendant

Asbury has no criminal history, is employed, and pleaded guilty quickly after having been arraigned.

Despite this, Asbury minimized his conduct and lied to the FBI during his post-arrest interview. Asbury attempted to paint himself as someone who was helping both the rioters and

the police, when, in truth, his actions impeded the police's ability to defend themselves, the Capitol, and the members of Congress inside the Capitol.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Asbury's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. Asbury told the FBI that he traveled to Washington, D.C., on January 5 essentially on a whim. This impulsive decision ended in Asbury engaging in serious criminal conduct. This, combined with the fact that Asbury only expressed remorse after having been arrested, indicates that Asbury repeatedly prioritized his interests over those of law enforcement.

### E.      The Importance of the Guidelines

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section

3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Kumer*, 23-cr-237 (CJN), is one such case. There, Kumer and his mother pushed into the tunnel, where they remained for almost 25 minutes. During this time, Kumer joined the rest of the crowd in the tunnel and pushed in unison against the police line. At one point, as he pushed hard with his back toward the police, he called out encouragement to other rioters, saying, "LET'S GO! C'MON! LET'S GO!" Even after he was removed from the tunnel, Kumer remained on the Inaugural Stage near the police line for several more minutes. Kumer pleaded guilty to a violation of 18 U.S.C. § 231(a)(3). Like Asbury, he fell into criminal history Category I. His Guidelines range was 12 to 18 months. One of the pushes in which Kumer was involved resulted in bodily injury to a police officer, so the parties agreed to a two-level enhancement. Judge Nichols sentenced him to 15 months of incarceration. Although it is not alleged that one of the pushes in which Asbury participated caused bodily injury to an officer, Asbury's physical conduct was more than Kumer's, he spent more time in and around the tunnel than Kumer did, and, like Kumer, cheered for and encouraged his fellow rioters. This Court should similarly impose a Guidelines sentence at the midpoint.

In *United States v. Shawn Price*, 22-CR-106 (CJN), Price pushed against fellow rioters who pushed up against the police line on the West Plaza. Price interfered with officers on at least two different occasions on the West Plaza within the span of approximately five minutes. After January 6, like Asbury, Price minimized his conduct in an interview with the FBI. Price ultimately pleaded guilty to a violation of 18 U.S.C. § 231(a)(3). Price fell into criminal history Category III.

29

His Guidelines range was 12 to 18 months. Judge Nichols sentenced him to 12 months of incarceration. Asbury's one hour in and around the tunnel (in contrast to Price's five minutes) and three separate push efforts (in contrast to Price's two) against the police line warrant a sentence at the midpoint of the range.

Finally, in *United States v. Roger Baugh*, 22-CR-313 (JEB), Baugh engaged in several heave-ho pushes against the police, like Asbury. Baugh was also dishonest with the FBI. Baugh pleaded guilty to a violation of 18 U.S.C. § 231(a)(3) and had a Guidelines range of 8 to 14 months. Like Asbury, he fell into criminal history Category I. Judge Boasberg sentenced Baugh to 12 months and 1 day of incarceration, above the midpoint of the Guidelines range.

While no one case is a perfect match – and thus why §3553(a)(6) is only one part of the inquiry – the comparators serve to suggest that a midpoint sentence is an appropriate metric and recommendation.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Asbury must pay $2,000 in restitution, which reflects in part the role Asbury played in the riot on January 6.[10] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Asbury's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 148.

## VIII.   FINE

Asbury's conviction for violating 18 U.S.C. § 231(a)(3) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). The guidelines fine range here, for offense level 11, is $4,000 to $40,000. U.S.S.G. § 5E1.2(c). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial

---

[10] Unlike under the Sentencing Guidelines for which the Government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the PSR concludes that Asbury does not have the ability to pay both restitution and a fine. PSR ¶ 123.

## IX.    CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of 11 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    */s/ Carolina Nevin*
CAROLINA NEVIN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
NY Bar No. 5226121
(202) 803-1612
Carolina.Nevin@usdoj.gov